Ahmad **BODAGHI** and State Personnel
Board, State of Colorado,
Petitioners,

v.

**DEPARTMENT OF NATURAL
RESOURCES,** Respondent.

No. 98SC304.

Supreme Court of Colorado,
En Banc.

March 13, 2000.

Roman, Benezra & Culver, L.L.C., Gilbert M. Roman, Seth J. Benezra, Lakewood, Colorado, Attorneys for State Personnel Board.

James R. Gilsdorf, Denver, Colorado, Attorney for Ahmad Bodaghi.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Jeannette W. Kornreich, Deputy Attorney General, State Services Section, Joseph C. Smith, Jr., Deputy Attorney General, Cheryl A. Linden, First Assistant Attorney General, Natural Resources Section, Karen S. Howard, Deputy Attorney General, Steven A. Chavez, Assistant Attorney General, Jill M.M. Gallet, Assistant Attorney General, Consumer Protection Section, Denver, Colorado, Attorneys for Respondent.

Luis A. Corchado, Denver, Colorado, Attorney for Amicus Curiae Colorado Hispanic Bar Association.

Thomas A. Feldman, Denver, Colorado, Barry D. Roseman, Denver, Colorado, David Lichtenstein, Denver, Colorado, Brian T. Moore, Denver, Colorado, Michael P. Cerbo, Denver, Colorado, Karla J. Pierce, Littleton, Colorado, Cynthia E. Wellbrock, Boulder, Colorado, Attorneys for Amicus Curiae Plaintiff Employment Lawyers Association.

Justice SCOTT delivered the Opinion of the Court.

We are called upon to review and make clear the application of Colorado law prohibiting discriminatory or unfair employment practices and thus to decide a case involving claims of unlawful employment discrimination in the context of a state agency's promotion practices. In *Bodaghi v. Department of Natural Resources,* 969 P.2d 718, 724 (Colo.App.1998), on our remand, the court of appeals rejected the findings and conclusions of Robert W. Thompson, Jr., the administrative law judge (ALJ) and reversed the order of the State Personnel Board that found that the Department of Natural Resources engaged in unlawful and intentional discrimination. Before the ALJ, the employee had made a prima facie case of discrimination and

the employer had proffered a non-discriminatory basis for its promotion decision, which the ALJ found from all the evidence in the record to be incredible and untrue. Relying upon evidence in the record, the ALJ found that the Department engaged in unlawful discrimination.

In this case, then, we must resolve an important issue: Whether it is permissible for an ALJ to infer from all the evidence in the record that the Department's employment decision constituted unlawful discrimination when the ALJ has rejected as incredible evidence offered to support the Department's assertion of a non-discriminatory purpose. We conclude that such an inference is permissible, relying upon our recent precedent in *Colorado Civil Rights Commission v. Big O Tires, Inc.,* 940 P.2d 397 (Colo.1998).

We wish to make patently clear that in Colorado "[w]here a *prima facie* case of discrimination is proven and the reasons given [by the employer as a legitimate, nondiscriminatory action] are found to be a pretext for that discrimination, no additional evidence is required to infer intentional discrimination." *Id.* at 402.[1]

## I.

Because of the importance of the questions raised and the apparent discrepancy between the judgment of the court of appeals and our recent opinion in *Big O Tires,* we granted certiorari to review the court of appeals' judgment in this case. We now reverse the judgment of the court of appeals.

In *Bodaghi,* the court of appeals rejected the order of the State Personnel Board (Board), which affirmed the finding of intentional discrimination by its ALJ.[2] We granted certiorari to determine whether evidence beyond that used to make a prima

---

1. Similarly, the United States Supreme Court has held that a "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

2. It is the order of the State Personnel Board that was appealed to the court of appeals. However, because that Board adopted without modification the findings of fact and conclusions of law contained in the initial decision of the ALJ, we will use the terms "ALJ" and "Board" interchangeably.

facie case and to refute the employer's proffered evidence of non-discriminatory purpose is necessary to permit an inference of intentional discrimination. We also granted certiorari to determine whether the court of appeals erred in substituting its findings for those of the ALJ.[3] We hold that where an employee has made a prima facie case of discrimination and the factfinder disbelieves the proffered evidence of the employer, a factfinder may infer intentional discrimination without requiring additional evidence from the employee. We also conclude that the court of appeals erred in holding that "the record was insufficient to sustain a finding that the complainant was discriminated against because of his ethnic background." 969 P.2d at 725. Furthermore, we conclude that the court of appeals improperly substituted its own findings and conclusions for those of the ALJ. Accordingly, we return this case to the court of appeals with directions that it reinstate the order of the Board.

## II. Facts

### A. Background

In 1984, petitioner Ahmad Bodaghi (Bodaghi), an Iranian-born citizen of the United States, began his employment as an Engineer A with the State Land Board, an agency within the Department of Natural Resources (Department). After 1984, Bodaghi was promoted four times to positions of increasingly higher grade within the Land Board, the fourth position being that of Engineering/Physical Sciences Technician II, Grade 87. Bodaghi was consistently assigned addi-

tional duties and was promoted to the Technician II position as a result of a desk audit of the position to which he had been previously assigned. At the time of the reallocation, petitioner was selected without competing with other candidates.

In 1991, Bodaghi was named State Land Board Employee of the Year. After being reallocated to the position of Technician II, he continued to assume additional duties, including responsibility for the Land Board's right-of-way acquisition program. As a result of these additional responsibilities, Bodaghi requested another desk audit. His job description was reviewed and approved by his supervisor, John Brejcha, and the appointing authority, Max Vezzani, on August 20, 1992, and provided an accurate description of Bodaghi's duties.

In August 1992, Bodaghi's position was reallocated from its current class of Engineering/Physical Sciences Technician II, Grade 87, to Program Administrator I, Grade 95.[4] The job description for the Program Administrator I, Grade 95, specified the percentage of time spent for the work to be performed. The work was distributed in the following manner: thirty percent of the work performed was designated rights-of-way work whereby the successful applicant would be responsible for processing and coordinating all rights-of-way; fifteen percent of the work performed involved the responsibility for processing and coordinating applications for water wells; fifteen percent was allocated to special use permits; fifteen percent for improvements pertaining to water wells; fif-

---

3. Our order granting certiorari set forth the following issues:
   1. Whether, after this court's recent decision in *Colorado Civil Rights Commission v. Big O Tires, Inc.*, 940 P.2d 397 (Colo.1997), the court of appeals erred by requiring additional evidence to support an inference of intentional discrimination when the employee proved both a *prima facie* case of discrimination and that the reason the employer advanced for the adverse employment action was pretextual; that is, whether the court of appeals erred by adopting a "pretext plus" additional evidence of discrimination standard for evaluating whether an employee has proven unlawful discrimination when this court approved a "permissive pretext" standard in its recent *Big O Tires* decision.

   2. Whether, consistent with this court's recent decision in *Colorado Civil Rights Commission v. Big O Tires, Inc.*, 940 P.2d 397 (Colo. 1997), the court of appeals erred as a matter of law by rejecting as insufficient evidence a fact finder's permissive inference of intentional discrimination where the employee proved a *prima facie* case of discrimination and that the non-discriminatory reasons the employer gave for the adverse employment action were pretextual.

   3. Whether the court of appeals erred by substituting its conclusions for the findings and inferences from such findings by the Administrative Law Judge.

4. Thus, a new position was created for which Bodaghi could compete.

teen percent for rights-of-way assignments; and ten percent for tower sites. A review of the work to be performed demonstrates that almost half the work (forty-five percent) was comprised of rights-of-way assignments.

This upgraded position represented a dramatic increase in salary and in grade over his former position and was classified as a management-level, administrative position, as distinguished from his former position, which was classified as technical in nature. At the time of the reallocation, Kim Burgess, the Department's personnel analyst, informed Bodaghi that the position would be filled without an examination process. In addition, Bodaghi was advised that if there were fewer than four qualified applicants for the reclassified position, Vezzani would appoint the incumbent.

On January 29, 1993, Vezzani began soliciting applications for the position. Vezzani issued a "Notice of Proposed Reallocation and Position Examination," limiting applicants to employees of the Department. On February 1, 1993, in addition to the normal job announcement, Vezzani sent a memorandum to all staff members encouraging them to submit applications for the position and inviting phone calls from anyone with questions about the job duties or the application process. At the staff meeting, Vezzani urged anyone interested to apply even if he did not feel fully qualified.

In comparison to past practices, Vezzani's solicitation of applications was unusual. Past practice had been to simply post the announcement on the bulletin board or through electronic-mail. The historical practice of the Land Board was to automatically select a satisfactorily performing incumbent to be appointed to fill a reclassified position whenever there were fewer than four applicants. For example, prior to the second reallocation of Bodaghi's position, Vezzani had upgraded three positions. In each prior case, even though confronted with more than one applicant for the position, the incumbent was selected without the benefit of an examination or interview process.

As a result of the unusual open solicitation for his position, Bodaghi became concerned and approached Vezzani. He discussed his concern with Vezzani, who told him to try to be among the top three if a test were given.

When asked about the discrepancies in the selection process for Bodaghi's position, Vezzani gave several reasons for the unusual process and stated that he formalized the selection procedure for Bodaghi's reallocated position. Vezzani said the disparate procedure was justified because it was a "high level" position, the commissioners had advised him to seek the best qualified applicants when filling any vacancy, and the other employees wanted a more open hiring process.

In any event, the new selection process resulted in three applicants for Bodaghi's reallocated position: (1) Bodaghi, himself; (2) Dennis DeVore, a Minerals Manager in Greeley; and (3) Robert Clift, a District Manager in Pueblo. Since there were fewer than four applicants for the position, a competitive test of competence was not required. Nonetheless, the selection process, which consisted of three parts, included a two-hour written examination. Under the selection process, each of the three applicants was required to prepare and submit briefing papers on two issues, complete a two-hour written exam consisting of twenty-four questions, and participate in a one-hour interview conducted by a panel selected by Vezzani. Vezzani appointed a selection panel that included John Brejcha, Surface Sections Manager; Mark Davis, Minerals Director; John Wilkes, Land Board Commissioner; and Vezzani.

During the hearing before the ALJ, Jeanette Scriven, an Accounting Technician III with the Board of Land Commissioners, testified that Ahmad did not "fit in [Vezzani's] agenda" because Max has a "good old boy" network and she felt that "Ahmad did not fit that." When asked who was included in this "good old boy network," Ms. Scriven replied, "John Brejcha, Dennis DeVore, Scott Price, Mark Davis, and Max Vezzani."[5] Ironically,

---

5. The following is an excerpt from the testimony of Jeanette Scriven on direct examination:

Q. Okay. In comparing the process used to promote Mr. DeVore and the way Mr. Bodaghi's

two of the members of the "good old boy network" were on the panel selecting DeVore for the position of Program Administrator I. We also note that Scott Price, another member of the "good old boy network," was not subjected to the selection process as was Bodaghi.[6]

At the conclusion of the selection process, DeVore, a Caucasian male, was selected to fill Bodaghi's reallocated position. In his assessment of the applicants, Vezzani ranked DeVore first on all parts of the selection criteria. John Brejcha also ranked DeVore first, recommending that they offer the position to DeVore "to utilize his skills in this position. Then in the future, to expand this position's duties and responsibilities to capture the opportunity of incorporating [DeVore's] appraisal and field inspection skills and expertise to create a broader 'real estate specialist' role for the Land Board." Mark Davis and John Wilkes also ranked DeVore number one. Based on the rankings of the panel, Vezzani concluded that DeVore was the most qualified candidate and the best person for the job.

On March 4, 1993, Bodaghi received written notification that he would be laid off effective April 30, 1993. He then exercised his "bumping rights"[7] to transfer into the position of Engineering/Physical Sciences Technician I-B at the Division of Wildlife. He currently holds the position of Technician II with that agency.

### B. Procedural History

Bodaghi filed a timely appeal with the State Personnel Board on March 12, 1993, alleging discrimination on the basis of national origin. The matter was referred to the Colorado Civil Rights Division for investigation. The Civil Rights Division issued an Opinion of No Probable Cause on March 14, 1994. Bodaghi received notice of the Civil Rights Division opinion on April 3, 1994, and filed an appeal the following day.

The ALJ conducted an evidentiary hearing and issued lengthy and detailed findings and conclusions. In his findings of fact, the ALJ found that Bodaghi established a prima facie case of discrimination by meeting the minimal requirements set forth in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). He also found that the Department satisfied its burden of asserting or coming forward with a legitimate business reason for not selecting Bodaghi for the position.

The ALJ found evidence establishing that discriminatory intent motivated the Department to promote DeVore ahead of Bodaghi, including: (1) DeVore's duties did not include the administration of rights-of-way[8]; (2) one of the factors considered by the panel in selecting the successful applicant was real estate appraisal experience, which was not a requirement listed in the job announcement; (3) the reallocation of the subject position

---

position was handled, do you think that Mr. Bodaghi was treated fairly?
A. No, sir.
Q. Why do you believe that?
A. (Pause) I don't feel that he fit Max's agenda.
Q. What do you mean by that?
A. I feel that Max has a good old boy network and I don't think Ahmad fit that. And that's a personal opinion.
Q. What do you base that on?
A. Observation and working with the man for three years.
Q. Mr. Vezzani?
A. Mr. Vezzani, correct.
Q. Who would be included in this good old boy network?
A. It's very uncomfortable to answer these questions when you have to work at the land board.
JUDGE THOMPSON: You still have to answer to them, however.

THE WITNESS: Yes, sir. Um, John Brejcha, Dennis DeVore, Scott Price, Mark Davis and Max Vezzani.

6. We also note that there were no female members nor any minority members of the "good old boys" network.

7. Upon abolition of a position through reallocation in the State Personnel System, the employee has the right to exercise his retention rights within the department for which he worked. The employee has the right to select one position from a list of available positions with similar base pay, status, and tenure.

8. DeVore testified at the hearing that he had "appraisal experience in the field of right-of-way."

was based on the actual duties being performed by Bodaghi; (4) the Department openly sought applicants for the reallocated position, contrary to past practice; and (5) Vezzani informed Bodaghi that there would be no problem with him staying at the lower level (Grade 87) but not at the higher level (Grade 95).

Relying upon the evidence in the record and making credibility determinations, the ALJ, as the factfinder, concluded that the Department's reasons for not selecting Bodaghi were a "pretext for discrimination" and that the discrimination was the result of a "glass ceiling – an invisible barrier beyond which [Bodaghi] could not rise." The ALJ further concluded that the "hiring procedure was implemented for the purpose of filling the Administrator position with someone other than the incumbent because of the incumbent's national origin." Without modification, the State Personnel Board adopted the ALJ's findings and conclusions, and ordered that Bodaghi be appointed to the reallocated position with full pay and benefits.

The Department appealed, and argued that there was insufficient evidence to support the ALJ's findings that it had discriminated against Bodaghi based on national origin. It argued that Bodaghi failed to prove that its proffered non-discriminatory reasons, either for selecting the other applicant or for implementing the selection process, were pretexts for unlawful discrimination. In *Bodaghi v. Department of Natural Resources,* 943 P.2d 1 (Colo.App.1996) (*Bodaghi I* ), the court of appeals agreed with the Department and rejected the ALJ's finding that the Department's proffered reasons for implementing the selection process were pretexts for discrimination. The court of appeals rejected the Board's conclusion that the Department unlawfully discriminated against Bodghi in not selecting him for the reallocated position. *See id.* at 6.

Thereafter, on an earlier petition for certiorari, we vacated the judgment of the court of appeals and remanded the case for reconsideration in light of our judgment and opinion in *Colorado Civil Rights Commission v. Big O Tires, Inc.,* 940 P.2d 397 (Colo.1997). It is that reconsideration by the court of appeals and its resultant judgment in *Bodaghi v. Department of Natural Resources,* 969 P.2d 718 (Colo.App.1998) (*Bodaghi II* ), that is before us today.

On remand and reconsideration, the court of appeals again reversed the Board's order and concluded that the Department "me[t] its burden of production." *Bodaghi II,* 969 P.2d at 720. The court of appeals reasoned that "the nature of the evidence presented by [Bodaghi] to establish a prima facie case will also be sufficient to allow the inference that the pretextual nature of the reason given by the employer evidences an intent to hide a discriminatory motive." *Id.* at 721. The court of appeals then concluded that the evidence was insufficient to sustain a finding that Bodaghi was discriminated against because of his ethnic background. *See id.* at 722. The court of appeals held that the ALJ's "findings that the [Department's proffered reasons or] explanation for [the purpose of the selection process were] unbelievable cannot support the ultimate finding of discrimination." *Id.*

We now review the court of appeals' judgment in *Bodaghi II.* However, we first address the legal context in which its judgment was rendered.

### III.

Coloradans share in a great nation that has in recent times attempted to live out its creed—that all its citizens are created equal and are endowed with certain inalienable rights: life, liberty, and the pursuit of happiness. Nonetheless, it is beyond peradventure that discriminatory practices impair the lives of citizens who bear the unfortunate burdens of present effects of past history and are thereby denied the opportunity to fully and fairly participate in this nation's bounty. Moreover, discriminatory practices deny Coloradans and others the benefit of the full utilization of this nation's greatest asset, its people, making us less for it.

A responsive Colorado General Assembly, therefore, has long recognized the need to outlaw discriminatory and unfair employment practices, including hiring and promotion decisions of employers in our state. State

judges have also long understood the pernicious and often debilitating nature of employment discrimination. For some time and at least since 1954, it has been known that "[o]ne intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive for we deal with an area in which 'subtleties of conduct ... play no small part.'" *Holland v. Edwards*, 307 N.Y. 38, 119 N.E.2d 581, 584 (1954).

Today, because unfair employment practices remain widespread and pernicious, under section 24–34–402, 7 C.R.S. (1999), Coloradans may effectively remedy unlawful conduct through administrative proceedings. Most recently, in *Big O Tires*, 940 P.2d at 397, we adopted an analysis that is even-handed and principled, and assures that minimal protection is extended to those citizens most often subjected to unfair employment practices.

Analysis of the issue before us must begin with the purpose of section 24–34–402 and our employment discrimination laws. The primary purpose of these laws is to "assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To achieve this same purpose, legislatures proscribed "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Thus, the United States Supreme Court has repeatedly held that "a prima facie [case of discrimination] may be established by policies and practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." *General Elec. Co. v. Gilbert*, 429 U.S. 125, 137, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

It has long been settled that in cases involving intentional discrimination, direct evidence of discrimination is rare. We have noted that "the facts necessarily vary in these cases, and the specification ... of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to different factual situations." *Big O Tires*, 940 P.2d at 402 n. 3 (quoting *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817). Thus, we recognize that employees must often rely on indirect evidence and reasonable inferences to establish a case of discrimination under the *McDonnell Douglas* analysis. There should be "nothing novel about establishing [intentional discrimination] through the use of circumstantial evidence, for ... circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir.2000). In fact, circumstantial evidence is often particularly helpful when, as here, a case turns on vacillating issues such as motive or intent. As the United States Supreme Court wrote half a century ago:

> [W]hile objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does.... [C]ourts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.

*American Communications Ass'n v. Douds*, 339 U.S. 382, 411, 70 S.Ct. 674, 94 L.Ed. 925 (1950). In employment discrimination cases, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Additionally, "[v]ictims of heavy-handed uses of the spoils system [should] not [be] limited to redress in only those (relatively rare) instances in which a 'smoking gun' can be produced." *Acosta–Orozco v. Rodriguez–de–Rivera*, 132 F.3d 97, 102 (1st Cir. 1997). In light of the foregoing, we now proceed to examine prohibited employment practices in Colorado.

## IV.

Our state law prohibiting employment discrimination or unfair employment practices is found in section 24–34–402, which provides in pertinent part:

> (1) It shall be a discriminatory or unfair employment practice:
>
> (a) For an employer to refuse to hire, to discharge, to promote or demote ... during the course of employment, or to discriminate in matters of compensation against any person otherwise qualified because of disability, race, creed, color, sex, age, national origin, or ancestry....

In *Big O Tires*, we were presented with the opportunity to address this statutory prohibition. We examined "our state law" to determine "whether ... intentional discriminat[ory or unfair employment practices] may be inferred." *Big O Tires*, 940 P.2d at 399. There, we reversed the court of appeals' judgment made in reliance upon earlier decisions of that court.

In an opinion crafted by Chief Justice Vollack for a unanimous court, we noted that earlier decisions of the court of appeals reasoned that "racial discrimination may not be inferred as a basis for the discharge unless such discrimination is supported by *substantial* evidence." *Id.* (citing *Colorado Civil Rights Comm'n v. State*, 30 Colo.App. 10, 18, 488 P.2d 83, 87 (1971) (emphasis added); *Adolph Coors Co. v. Colorado Civil Rights Comm'n*, 31 Colo.App. 417, 423, 502 P.2d 1113, 1116 (1972)). However, we noted that such reasoning by the court of appeals "fails to address whether intentional discrimination may also be inferred when the employer's reason for an employment decision is found to be pretextual." *Big O Tires*, 940 P.2d at 399.

We then turned to better reasoned cases to analyze the facts then before us. Rejecting the ambiguous standard of "substantial evidence" that misguided the court of appeals, we reversed the judgment of the court of appeals and "adopt[ed] the Supreme Court's analysis set forth in *McDonnell*

*Douglas*, ... which represents a clear and thorough analytical framework for evaluating claims of employment discrimination." *Big O Tires*, 940 P.2d at 400. We here set forth the analytical framework approved of in that case and which today governs Colorado law.[9]

■ In order to prove intentional discrimination under section 24–34–402, a plaintiff must first establish, by a preponderance of the evidence, a "prima facie" case of discrimination. *See id.* The elements of such a prima facie case of unfair employment practices are fairly straight-forward and were set forth in *Big O Tires*. *See id.* at 400–01. We restate those factors here. First, an employee must show that he belongs to a protected class. Second, the employee must prove that he was qualified for the job at issue. Third, the employee must show that he suffered an adverse employment decision despite his qualifications. Finally, the employee must establish that all the evidence in the record supports or permits an inference of unlawful discrimination. *See id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ Under the *McDonnell Douglas* framework adopted by this court in *Big O Tires*, when the prima facie case is established, "a presumption [is created] that the employer unlawfully discriminated against the employee." *Big O Tires*, 940 P.2d at 399. Like other presumptions in our law, if the employer does not successfully rebut the presumption arising from the prima facie case, then a conclusion is required in favor of the employee that the conduct constituted discriminatory or unfair employment practices prohibited by section 24–34–402. *See St. Mary's Ctr.*, 509 U.S. at 506, 113 S.Ct. 2742. While the burden of *proof* remains at all times with the employee claiming discrimination, this presumption places upon the employer the burden of producing an explanation to rebut the prima facie case. Thus, the employer must set forth an explanation or non-discriminatory basis for its action. The

9. In doing so, we first note that in our view while some courts have found difficulty with this standard, it is not a complicated or intricate standard. When applied fairly, it places no undue burden upon employers, while extending minimal protection from invidious and often debilitating discrimination too frequently present in the workplace.

employer, naturally, then has the burden of "producing evidence" that the adverse employment action was taken because of a legitimate, non-discriminatory reason. *See id.* at 507, 113 S.Ct. 2742.

It is important to note, and we do so once again, that although the establishment of the prima facie case shifts the burden of *production* to the defendant, the defendant does not share in the burden of proof in an employment discrimination case. The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* If the employer articulates a legitimate, non-discriminatory reason for the adverse employment decision and provides evidence to support that legitimate purpose, the presumption of the prima facie case is rebutted, and "drops from the case." *Id.*

In any event, once the employer meets its burden by offering such a reason, "the complainant must then be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for the adverse employment decision were in fact a pretext for discrimination." *Big O Tires,* 940 P.2d at 401. This burden of proof, however, can be met by the evidence already in the record and does not require, in every case, that additional evidence be offered by the employee. The evidence establishing a prima facie case may be such that "no additional evidence is required to infer intentional discrimination." *Id.* at 398.

The determination that the employer has asserted a non-discriminatory basis for the questioned employment practice does not mean that the employer has successfully rebutted the employee's claims and is therefore entitled to prevail on the ultimate question of whether unlawful discrimination occurred. That determination depends upon the evidence submitted to support the employer's assertion, which itself involves a credibility assessment because the burden of production stage necessarily *precedes the credibility assessment stage. See St. Mary's Ctr.,* 509 U.S. at 509, 113 S.Ct. 2742 (emphasis added). At the end of the employer's evidence, the factfinder is then asked to decide whether an issue of fact remains to be determined. *See id.* No issue of fact remains if the employee established a prima facie case and the employer failed to rebut the prima facie case and meet its burden of producing evidence to conclude that there was, in fact, a non-discriminatory reason for the adverse action. *See id.* In such an event, not present here, the factfinder would be compelled to acknowledge the presumption arising from the employee's prima facie case and, hence, is required to find for the employee as a matter of law. *See id.*

If the employer succeeds in meeting its burden of production, that is, it asserts a non-discriminatory reason for the adverse employment decision, the factfinder cannot find unlawful discrimination without further consideration of the evidence presented, including credibility determinations. Assuming the employer offers evidence sufficient to sustain the proffered legitimate purpose, the employee cannot prevail in reliance solely upon the prima facie case. In that instance, the factfinder, giving full and fair consideration to the evidence offered by both sides, proceeds to decide the ultimate question: whether, in light of all the evidence in the record, the employee has proved that the employer intentionally and unlawfully discriminated against the employee. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

However, "[t]he factfinder's disbelief of the reasons put forth by the [employer] (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742. Therefore, the factfinder's rejection of the employer's proffered reasons will "permit the trier of fact to infer the ultimate fact of intentional discrimination." *Id.* In such an event, "no additional evidence of discrimination is required." *Big O Tires,* 940 P.2d at 402.

## V.

We now apply the foregoing principles of Colorado law to the facts of this case. In doing so, at the outset we note that the

Department concedes that Bodaghi established a prima facie case.[10] The Department, then, articulated a non-discriminatory business reason for not selecting Bodaghi for the position of Program Administrator I, that is, that the selection process was not discriminatory and that Dennis DeVore, the successful applicant, was the most qualified applicant and the best person for the position.

In this case, however, the ALJ, acting as the trier of fact, concluded that after a considered review of the entire record, Bodaghi would have been appointed to the position but for intentional discrimination. He further concluded that Bodaghi proved by a preponderance of the evidence that he was subjected to unlawful discrimination on the basis of his national origin and therefore he was not selected for the position. However, the court of appeals rejected the Board's order, which was based upon the findings of the ALJ.

On our review, we must now determine whether the judgment of the court of appeals comports with Colorado law and is consistent with *Big O Tires*. Our review of the record and the opinion indicate two fundamental errors. First, the court of appeals erred in concluding, contrary to the ALJ, that the successful applicant, Dennis DeVore, was more ·qualified than Bodaghi, when in fact DeVore did not meet the minimum requirements for the position. Second, the court of appeals erred in concluding that the selection process was "fair and not discriminatorily tainted" when the ALJ concluded otherwise, with more than ample support in the record. We address each of these fundamental errors in turn.

### A.

#### 1.

In *Bodaghi II*, the court of appeals concluded that DeVore was more qualified

than Bodaghi to administer the right-of-way program. This is contrary to the supported findings of the ALJ and therefore we disagree.

Based on its "detailed review of the record," *Bodaghi II*, 969 P.2d at 722, the court of appeals found that the "evidence is undisputed that [DeVore], a certified surveyor and an Appraisal Institute member, was more qualified to administer a right-of-way program than was [Bodaghi]." *Id.* Therefore, the court of appeals "conclude[d] that this record is insufficient to sustain a finding that [Bodaghi] was discriminated against because of his ethnic background." *Id.* at 725. Therefore, the court of appeals held that the ALJ's findings cannot support an ultimate decision of unlawful intentional discrimination. *See id.*

In the order of the Board, the ALJ found that upon reallocation, "Bodaghi's right-of-way position" became the Program Administrator I, Grade 95 position. The minimum qualifications and experience set out in the Notice of Proposed Reallocation required three years of professional right-of-way experience.[11] The ALJ found that DeVore's duties as a district manager *did not* include the administration of rights-of-way.

The ALJ found that "[o]ne of the reasons for selecting DeVore instead of Bodaghi was that DeVore possessed real estate appraisal skills which were not required for the position. This, too," was found by the ALJ, "to be a pretext." In his order, the ALJ found that "[o]ne of the factors considered by Vezzani in selecting DeVore was DeVore's experience as a real estate appraiser. Real estate appraisal was not among the duties of the position, and appraisal experience was

10. The elements of the prima facie case are as follows: (1) Bodaghi is of Iranian origin; (2) Bodaghi was qualified and applied for the position of Program Administrator I, Grade 95; (3) Bodaghi was rejected for the position and was ultimately discharged; and (4) the position was ultimately filled by a person in an unprotected class. *See id.* at 401 n. 3 (stating in failure-to-hire cases, the fourth prong is met when the position remains open and is ultimately filled by a person outside the protected class); *see also St.*

*Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. 2742.

11. The Notice of Proposed Reallocation specified the following: "Graduation from an accredited college or university with a bachelor's degree in business administration, engineering, civil engineering or real estate AND *three years of professional right-of-way experience* which included one year at the journey level." (Emphasis added.)

not a requirement listed in the job announcement." Further, the ALJ found that "[t]he land appraisal duties of the Land Board were performed by the five or six district managers. DeVore's duties as a district manager did not include the administration of rights-of-way."

In stark contrast, the record indicates that Bodaghi's experience and qualifications were the basis for reallocating the position. The ALJ found that the reallocation of the position of Program Administrator I was "based on duties being performed" by Bodaghi. The ALJ further found, "[t]he only difference was the grade level. The quality of his job performance was high in all areas. His oral and written presentations to the Board of Land Commissioners were commendable. He had, in effect, been the rights-of-way manager for three years. During that time, he received ratings of good or commendable on his performance evaluations." Additionally, the ALJ noted that soon after DeVore was selected for the position, Vezzani told Bodaghi that "he was the best technician [Vezzani] ever had and that there would be no problem with him staying at the lower level [Grade 87], but not at the higher level [Grade 95]." In fact, "Vezzani admitted that the only difference was the grade level."

The ALJ specifically concluded that "[e]stablished facts together with reasonable inferences support [Bodaghi's] belief that he was not going to be accepted in a management level position. There was nothing wrong with his job performance and no question of his qualifications. The difference was not that the job changed, but that the level changed." After a considered review of the entire record, the ALJ found that the agency was specifically looking for reasons not to select Bodaghi. He further concluded that but for intentional discrimination, Bodaghi would have been appointed to the position. As the ALJ stated later, Bodaghi encountered a "glass ceiling – an invisible barrier beyond which he could not rise." These findings, clearly showing the real qualifications and experience of the two candidates, formed the basis for the permissible inference and conclusion of intentional discrimination.

2.

An employer "has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine,* 450 U.S. at 259, 101 S.Ct. 1089. However, when an employer rejects an employee who is a member of a protected class for a position for which he is amply qualified, the critical determination is whether the two employees are equally qualified. *See id.* Furthermore, evidence that an employer has misjudged the qualifications of candidates may be "probative of whether the employer's reasons are pretexts for discrimination." *Id.* The use of subjective factors supports an inference of pretext when an employer justifies rejection of a minority candidate on the basis of such subjective factors even though the minority candidate is objectively better qualified than the non-minority chosen. *See Mohammed v. Callaway,* 698 F.2d 395, 401 (10th Cir.1983). The use of such subjective criteria as "thoughtfulness" and "creative" also may offer a convenient pretext for giving force and effect to discrimination. *See id.*

Here, Bodaghi possessed all the requirements for the position, and DeVore did not. DeVore was selected based on criteria not required for the position. At the time of the reallocation, Bodaghi was performing the duties of right-of-way manager. We must infer that a candidate who meets the specific requirements in the job announcement is better qualified than one whose selection depends upon alternative criteria.

In sum, Bodaghi provided sufficient evidence to support an inference of pretext with respect to DeVore being more qualified for the position. The record does not support the court of appeals' conclusion that DeVore was more qualified than Bodaghi. In fact, a fair reading of the record on appeal will not permit a finding that DeVore's qualifications were equal to those of Bodaghi. Simply stated, DeVore was not as qualified for the position as Bodaghi. Because our review of the ALJ's findings and the record indicates that the successful applicant, DeVore, did not meet the important right-of-way minimum requirements, we disapprove of any reliance

upon this basis as justification for rejecting the Board's order.

## B.

■ The court of appeals concluded that the ALJ found that "the selection process ... was fair and not discriminatorily tainted." *Bodaghi II*, 969 P.2d at 724. We are not persuaded and our examination of the record reveals no such findings.

The ALJ devoted much of his discussion to the selection procedure. This same selection procedure that the court of appeals states the ALJ found "fair," the ALJ extensively criticized. The ALJ found the decision to "institute a rigorous selection procedure totally unlike anything that had been done before at the Land Board." He found that "[i]n the past, where a position was reallocated upward and there was an incumbent, the agency did not interview applicants on the premise that the appointing authority already knew who the most qualified person was — it was the person holding the job." However, in this case, the ALJ found that it was "the first time such extensive procedures had been utilized to fill an occupied position, and in this case the job performance of the incumbent had been applauded by practically everybody." No other applicant except Bodaghi had ever been subjected to this full selection process. The ALJ therefore concluded that "the hiring procedure was implemented for the intended purpose of filling the Administrator position with someone other than the incumbent because of the incumbent's national origin."

The ALJ found that "[i]t was also disturbing that the agency openly sought applicants for this reallocated position, again contrary to past practice." The memos sent to staff members regarding other positions were not as suggestive as the one regarding Bodaghi's position. In addition, the ALJ found that Vezzani "encouraged applications for Bodaghi's position, ... even if an interested individual did not feel fully qualified." The ALJ further noted Vezzani's testimony that "he 'expect[ed] even more out of a Program Administrator' belie[d] the fact that Ahmad Bodaghi had a demonstrated history of doing more and more, thus enhancing the duties

and responsibilities of his position." Indeed, this was not the first time a position held by Bodaghi was reallocated.

On his review of the evidence and having the benefit of determining the credibility of witnesses before him, the ALJ concluded that Vezzani was specifically looking for reasons not to select Bodaghi. Out of disbelief of the evidence offered by the Department to support its asserted purpose for the selection process, the ALJ determined that the reasons provided were pretextual.

On this record, the court of appeals' determination that the selection process was appropriate, and was not properly rejected by the ALJ and the Board, cannot stand.

## VI.

■ It is because employers are usually careful not to offer smoking gun remarks indicating intentional discrimination, that the Supreme Court established the *McDonnell Douglas* approach as a means of evaluating indirect evidence of discrimination. *See Hasham*, 200 F.3d at 1044. However, on post-trial review, whether the plaintiff's case is based on direct or indirect evidence, the *McDonnell Douglas* framework drops out of the analysis and the reviewing court need only consider whether the record supports the resolution of the ultimate question of intentional discrimination. *See Big O Tires*, 940 P.2d at 401–02.

■ We do not and will not require, as the Department proposes, that an employee in an employment discrimination case establish by direct evidence that the proffered reasons were a cover-up for discrimination. It is simply too burdensome for an employee to prove the intent or purpose of patently unacceptable conduct, which leads to a permissible inference of discrimination. Our holding today is consistent with our holding in *Big O Tires*, 940 P.2d 397 (Colo.1998), as well as the holding of the United States Supreme Court in *St. Mary's Honor Center*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In *Big O Tires*, the complainant, Thurman, an African–American woman, was employed

as a sales clerk. During her period of employment, she worked on a sales crew with another Big O Tires employee, Edmonds. Apparently, both Thurman and Edmonds violated the time clock policies on numerous occasions. As a result of these violations, Thurman was terminated from employment. *See Big O Tires*, 940 P.2d at 398. Unlike Thurman, Edmonds, a Caucasian woman, received no immediate disciplinary action. Thurman filed a complaint with the Colorado Civil Rights Commission, alleging that Big O Tires discriminated against her on the basis of race. In support of her complaint, Thurman claimed that Edmonds had committed time clock violations as serious as those Thurman had committed, but had not been terminated.

Thurman established her prima facie case of discrimination. Big O Tires rebutted, articulating a legitimate non-discriminatory reason for firing Thurman: she had violated the company's time clock policies after being warned that such violation would result in her termination. *See id.* at 399. In response, Thurman presented evidence that Big O Tires' non-discriminatory reason was a pretext for discrimination. We concluded that the record contained sufficient evidence to support the ALJ's finding that Big O Tires was motivated by race when it terminated Thurman's employment.

In *Big O Tires*, we held that "[o]nce the employer meets the burden, the complainant must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for the employment decisions were in fact a pretext for discrimination." *Id.* at 402. There, we plainly stated, "[w]here a prima facie case of discrimination is proven and the reasons given for discharge are found to be a pretext for discrimination, no additional evidence is required to infer intentional discrimination." *Id.*

We find additional support for that holding in *St. Mary's Honor Center*. In *St Mary's Honor Center*, the Court stated that "[t]he factfinder's disbelief of the reasons put forth by the [employer] ... may, together with the elements of a prima facie case, suffice to show intentional discrimination." 509 U.S. at

511, 113 S.Ct. 2742. The Court further noted, "That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct. That *remains a question for the factfinder* to answer...." *Id.* at 524, 113 S.Ct. 2742 (emphasis added). In this case, the ALJ answered the question in the affirmative.

We reaffirm today what we said in *Big O Tires:*

> Once the employer meets its burden [of production], the complainant must then be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for the employment decision were in fact a pretext for discrimination. Where a prima facie case of discrimination is proven and the reasons given for discharge are found to be a pretext for discrimination, no additional evidence is required to infer intentional discrimination.

940 P.2d at 402.

We recognize that simply proving that the employer's stated reasons for the action are false does not compel a finding in favor of the plaintiff. *See St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742. However, "[t]he fact finder's disbelief of the reasons put forth by the [employer] (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination." *Id.* Therefore, "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of discrimination," and upon such rejection, "[n]o additional proof of discrimination is required." *Id.* (brackets in original); *see also Aikens*, 460 U.S. at 715, 103 S.Ct. 1478 (stating that when the defendant responds to the plaintiff's prima facie case by offering a reason for the plaintiff's rejection, the factfinder has before it all the evidence it needs to decide whether the "defendant intentionally discriminated against the plaintiff").

Under the facts of this case, the ALJ rejected the Department's asserted reasons as incredible and as pretextual. Accordingly, we conclude that the court of ap-

peals erred as a matter of law by rejecting the ALJ's permissive inference of intentional discrimination as insufficient where the fact finder found the proffered reasons to be a pretext for discrimination. Similarly, under the same reasoning, we hold that the court of appeals erred by requiring additional evidence to support an inference of discrimination when the employee proved both a prima facie case of discrimination and that the reason the employer provided for the adverse employment action was a pretext for discrimination.

## VII.

We also address whether the court of appeals erred in substituting its own findings and conclusions for those made by the ALJ. We conclude that the court of appeals erred in parsing through the record and testimony presented and making its own findings of fact in lieu of those made by the ALJ.

### A.

The findings of an administrative tribunal as to the facts shall be conclusive if supported by substantial evidence. *See* § 24-4-106, 7 C.R.S. (1999). Even when evidence is conflicting, the hearing officer's findings are binding on appeal, and a reviewing court may not substitute its judgment for that of the factfinder. *See Glasmann v. Department of Revenue,* 719 P.2d 1096, 1097 (Colo.App.1986). An agency's factual determination reasonably supported by the record is entitled to deference. *See Department of Revenue v. Woodmen of the World,* 919 P.2d 806, 817 (Colo.1996); *G & G Trucking Co. v. Public Utils. Comm'n,* 745 P.2d 211, 216 (Colo.1987).

The credibility of witnesses and the weight to be accorded their testimony lies within the province of the agency as trier of the facts. *See Goldy v. Henry,* 166 Colo. 401, 408, 443 P.2d 994, 997 (1968). Where the record supports the findings of the factfinder, the court of appeals is not at liberty to make an independent evaluation of the evidence and substitute its judgment for that of the factfinder. *See Linley v. Hanson,* 173

Colo. 239, 242–43, 477 P.2d 453, 454 (1970). As stated in *Goldy v. Henry:*

> [T]he credibility of witnesses as well as the weight of the testimony are peculiarly within the province of the commission to whom a statute entrusts the fact finding process. When a conflict in the evidence exists, it is not within the power of a reviewing court to substitute its judgment for that of the fact finding authority as to the weight of the evidence and the credibility of witnesses.

166 Colo. at 408, 443 P.2d at 997.

### B.

In this case, the ALJ, as the trier of fact, found that the following evidence sufficiently established that discriminatory intent motivated the Department to promote DeVore ahead of Bodaghi: (1) DeVore's duties as a district manager did not include the administration of rights-of-way; (2) one of the factors considered by the panel in selecting the successful applicant was real estate appraisal experience, which was not a requirement listed in the job announcement; (3) the reallocation of the subject position was based on the actual duties being performed by Bodaghi; (4) the agency openly sought applicants for the reallocated position, contrary to past practice; and (5) Vezzani informed Bodaghi that there would be no problem with him staying at the lower level (Grade 87) but not at the higher level (Grade 95). The ALJ gave weight and credence to the testimony of Bodaghi's witnesses, and applying its expertise to all of the evidence before it, disbelieved the Department's explanation of its stated purpose.

We conclude that the evidence presented to the ALJ was sufficient to sustain a finding that the Department discriminated against Bodaghi because of his ethnic background. Consistent with our precedent, we hold that "[w]here a *prima facie* case of discrimination is proven and the reasons given [by the employer as legitimate, non-discriminatory action] for discharge are found to be a pretext for discrimination, no additional evidence is required to infer intentional discrimination." *Big O Tires,* 940 P.2d at 402.

## VIII.

Accordingly, we reverse the judgment of the court of appeals. We therefore remand this case to that court with directions that it reinstate the State Personnel Board's order finding that the Department of Natural Resources intentionally discriminated against Ahmad Bodaghi based on his national origin, in violation of our fair employment practices law.

Justice KOURLIS dissents, and Justice RICE joins in the dissent.

Justice KOURLIS, dissenting.

I do not find support either in the law as set forth in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) and *Colorado Civil Rights Commission v. Big O Tires, Inc.,* 940 P.2d 397 (Colo.1997) or in the evidence presented to the Administrative Law Judge (the ALJ) for a conclusion that the Colorado Department of Natural Resources (the Department) intentionally discriminated against Ahmad Bodaghi. Therefore, I respectfully dissent.

## I.

There is little doubt that the Department of Natural Resources and Max Vezzani, Bodaghi's superior and the appointing authority, valued the contributions of Bodaghi during his tenure with the Department from 1984 until 1993.[1] During that time, the Department promoted him four times and named him "State Land Board Employee of the Year" in 1991. One of the promotions involved a reallocation of Bodaghi's position while Max Vezzani managed the Land Board.

Despite his upward movement, Bodaghi believed he deserved greater compensation for his efforts because he had taken on additional responsibilities since the previous audit. Thus, he sought another reallocation of his position. Inherent in any upward reallocation, however, is the risk that other qualified candidates may apply for the position. As a part of the reclassification process, Bo-

daghi drafted a job description. In it, Bodaghi indicated that the position required, among other things, knowledge of right-of-way laws, land economics, leases, titles, and real estate values, and the ability to plan, organize, and complete projects. Bodaghi convinced the authorities. With Vezzani's support, Bodaghi successfully obtained the reallocation of his position to Program Administrator I, a dramatic increase. Unfortunately for Bodaghi, other candidates desired the position, and Vezzani selected another person.

There were two areas to which the ALJ looked for evidence of improper bias. The first was the hiring process, and the second was the hiring decision. In accordance with applicable personnel rules, Vezzani elected to adopt an objective, structured, selection process for two management level reallocated positions. He explained that he made the change because the reallocation of Bodaghi's position was "high level" and there were few such positions within the Land Board; the commissioners requested that he fill any vacancies with the best candidates; and other employees wanted a more open hiring process. Vezzani also testified that he believed that the Land Board employed very few professional level employees. Because of the heightened level of the position, he planned to allocate more responsibility to the job and wanted to make sure he selected the best available candidate.

Having determined that he would use a new hiring process to fill Bodaghi's reallocated position, Vezzani delivered a memorandum (the Bodaghi memo) to all staff members encouraging them to apply for the position. The letter explained, "[i]n order to better keep everyone informed of personnel actions I have decided to personally circulate notices of this nature as a matter of course. Therefore in the future whenever any of these land type actions come through I will circulate copies to the Land Board staff." It also stated, "[h]owever, the immediate decision for you is whether or not you

---

1. Because, as set forth below, I do not believe that the evidence supports the ALJ's findings of fact, I do not limit my narrative to those findings, but rather discuss the evidence presented to the ALJ.

wish to apply for the position." In addition to the memorandum, Vezzani verbally urged employees to apply for the job during a staff meeting.

Similarly, a few days later, Vezzani issued a memorandum (the Price memo) explaining that he would use the same new process to fill Mr. Price's reallocated position.[2] The Price memo mirrored the previous one except it did not include the above quoted language.[3] Price, like Bodaghi, disliked the implementation of this new hiring scheme. To Price's benefit, however, the only other applicant for that position withdrew from consideration, making a competitive hiring process unnecessary.

The new selection system consisted of several steps including briefing papers on two issues, a written exam, and an interview. All three parts were evaluated by several people.[4] The panel chosen by Vezzani consisted of himself, the Surface Sections Manager, the Minerals Director, and a Land Board Commissioner. Vezzani had not used the system when filling three previously reallocated positions, but had used similar processes to fill position vacancies. Two of the reallocations related to secretarial type positions and the other to a high level position, a position Vezzani filled with the incumbent.[5]

Bodaghi, Robert Clift, District Manager at Pueblo, Dennis DeVore, Minerals Manager in Greeley, and William Killip, Special Projects Manager for the Land Board, initially applied for the reallocated position, but the Personnel Board did not allow Killip to participate in the selection process because he had submitted his application after the deadline. Witnesses indicated that they found the position attractive in large part because of its management status and substantial salary. In a memorandum to the candidates, Vezzani indicated:

2. Mr. Price was not a member of any protected group.

3. The Colorado Civil Rights Division concluded that the Price memorandum contained the language encouraging people to apply, but the version contained in the record does not contain such language.

4. Although the Department's Personnel Analyst informed Bodaghi that there would not be an

You should know that my personal philosophy is that the incumbent has a slight edge in that he has been doing the job. What that means to me is that if it is a close call between [Bodaghi] and one or more of the candidates, I would be inclined to appoint the incumbent. However, the Commissioners and I want to assess each of your individual knowledge, skills and abilities. Our bottom line is quite simple—who can do the best job for the [Land Board].

With respect to the hiring decision, all four panel members ranked the successful applicant, Dennis DeVore, first among the three candidates. At the time of selection, DeVore had worked for the Department for twelve years, had earned two of the highest designations in the appraisal profession, the MAI and the ARA, had more than two years of experience as a professional right-of-way agent for an engineering firm, had worked for six years as an independent appraiser which included significant right-of-way duties, and had surveyed right-of-ways for about a year. The panel noted DeVore's fine performance during the interview portion of the process and favored his real estate appraisal skills, despite the fact that such experience was not a formal job requirement.[6]

Two of the panel members provided written evaluations to Vezzani, while the third offered his recommendation to Vezzani verbally. The panel articulated several specific reasons for the recommendation to hire DeVore. "DeVore is clearly the leader in terms of organization of thoughts and clear communication and writing ability." "DeVore had 6 good to excellent answers to the 10 questions ... [Bodaghi] had 3 to 2 good to excellent answers." "[Bodaghi] had difficulty grasping what some answers [sic] the panel was looking for, has below average ability to commu-

examination process, that letter was based on the Department's practices prior to Vezzani's decision to change the hiring process.

5. Vezzani had worked with the incumbent for several years both at the State Land Board and at the Division of Parks and Outdoor Recreation.

6. Real estate appraisal responsibilities have since been assigned to this position.

nicate his thoughts orally, [and] had to be prompted several times to give the complete answer." "[DeVore] gave concise answers directly addressing the questions posed, oral communication skills are very good, thinks quickly on his feet and uses analogies and examples very well." "Without question Dennis far surpassed [Bodaghi] ... in the oral portion of this exam. His answers were thought out, concise and in my opinion correct." Consistent with the recommendations of all members of the panel, Vezzani appointed DeVore to the position.[7]

Having been laid off by the Department, Bodaghi later exercised his bumping rights and transferred to the Colorado Division of Wildlife. Today, Bodaghi holds the same level of position that he held prior to the reallocation of his Department position.

## II.

The law applicable to this case invites confusion because of the concepts of shifting burdens of proof and production. We attempted to clarify the applicable test in *Colorado Civil Rights Commission v. Big O Tires, Inc.*, 940 P.2d 397 (Colo.1997). In *St. Mary's Honor Center v. Hicks*, the United States Supreme Court explained inconsistencies in previous opinions, and reiterated the test for proving a prima facie case of illegal discrimination outlined in *McDonnell Douglas* for proving intentional discrimination under Title VII of the Civil Rights Act of 1964. *See Hicks*, 509 U.S. at 506–20, 113 S.Ct. 2742. In *Big O*, we modified the Supreme Court test [8] slightly to accommodate broader forms of illegal discrimination. Thus, when bringing an employment discrimination suit under Colorado law, a plaintiff must first establish by a preponderance of the evidence a prima facie case of racial discrimination by showing: 1) that he belongs to a protected class; 2) that he was qualified for the position at issue; 3) that he suffered some type of adverse employment decision; and 4) that the cir-

cumstances gave rise to an inference of illegal discrimination. *See Big O*, 940 P.2d at 400.

Establishment of a prima facie case of intentional discrimination creates a presumption of unlawful discrimination. *See Hicks*, 509 U.S. at 506, 113 S.Ct. 2742; *Big O*, 940 P.2d at 400–01. This means the employer must provide a legitimate business reason for the employment decision, or it will lose the case. *See Hicks*, 509 U.S. at 506–07, 113 S.Ct. 2742; *Big O*, 940 P.2d at 401. Although the burden of production then shifts to the employer, the burden of proving intentional discrimination remains with the plaintiff. *See Hicks*, 509 U.S. at 507, 113 S.Ct. 2742; *Big O*, 940 P.2d at 401–02. When the employer carries this burden of production, the presumption in favor of the plaintiff disappears. *See Hicks*, 509 U.S. at 510–11, 113 S.Ct. 2742.

The employer, having effectively negated the prima facie case, then forces the trier of fact to decide whether the legitimate business reason for the employment decision was merely a pretext for illegal, intentional discrimination. *See id.* at 511, 113 S.Ct. 2742; *Big O*, 940 P.2d at 401–02. The factfinder may proceed to make this determination based on the plaintiff's prima facie case alone if the factfinder does not believe that the business reason proffered for the employment decision was legitimate; or the factfinder may hear and consider additional evidence. *See Hicks*, 509 U.S. at 511, 113 S.Ct. 2742; *Big O*, 940 P.2d at 402. Although no additional evidence is required, the plaintiff consistently maintains the burden of showing that the business reason was false, and that discrimination was the real reason for the hiring decision. *See Hicks*, 509 U.S. at 515, 113 S.Ct. 2742; *Big O*, 940 P.2d at 402. The plaintiff " 'must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a

---

7. Vezzani had attempted previously to appoint DeVore to a position with the Department, but DeVore declined the invitation because he wanted to remain in Greeley, Colorado at the time.

8. The United States Supreme Court test was established in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and clarified in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Hicks* arose under Title VII of the Civil Rights Act of 1964.

racially discriminatory decision.'" *Hicks,* 509 U.S. at 517, 113 S.Ct. 2742 (quoting *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. 1817).

The underlying premise is that the plaintiff must prove discrimination, not that the employer must prove the absence of discrimination: "Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of ... race," color, religion, sex, or national origin. *Id.* at 523–24, 113 S.Ct. 2742. Thus, the plaintiff maintains the burden in an employment discrimination suit of proving that the employer's business reason for its employment decision was a pretext for unlawful discrimination.

### III.

Bodaghi established a prima facie case of employment discrimination. Had the Department not explained its reasons for its business decision, the ALJ would have been required to find in his favor. However, the Department satisfied its burden of production by articulating several reasons for implementing the new hiring process and supporting the choice of DeVore as the most qualified person for the job. It is at this juncture in the analysis that I differ from the majority.

### A.

In my view, the court of appeals correctly applied the body of United States Supreme Court and Colorado case law. Because the presumption in favor of Bodaghi disappeared upon the Department's showing of a legitimate business reason for its selection of DeVore, the law then required Bodaghi to show that the adverse employment decision was a pretext for unlawful discrimination. It was then incumbent upon Bodaghi to demonstrate that the business reason was false, and that unlawful discrimination was the real reason. *See Hicks,* 509 U.S. at 515, 113 S.Ct. 2742; *Big O,* 940 P.2d at 401. The court of appeals explicitly stated that "[i]n this respect, there is no *requirement* that the complainant produce further evidence, and if the

factfinder determines that the reason given by the employer was not its true reason and that the given reason was simply a pretext for discrimination, a finding of discrimination will be sustained." *Bodaghi v. Department of Natural Resources,* 969 P.2d 718, 720 (Colo.App.1998). Thus, contrary to the majority's understanding, I do not read the court of appeals as adopting a requirement that a plaintiff must put forth additional evidence of illegal discrimination. Succinctly stated, the question is whether the Department's business reasons for hiring DeVore over Bodaghi were credible. Bodaghi bore the burden of showing that they were not and that unlawful discrimination was the real reason.

### B.

I return then to the facts before the ALJ. A finding that the business reason was a pretext for discrimination must be supported by sufficient evidence and not based on mere speculation. A reviewing court may reverse the decision of an administrative agency if the court finds that the agency acted arbitrarily or capriciously, made a decision that is unsupported by the record, or exceeded its authority. *See* § 24–4–106(7), 7 C.R.S. (1999). Unlike the majority, I find that the record does not support the finding that the Department unlawfully discriminated against Bodaghi. Indeed, I find no evidence of such an inference and a substantial amount of evidence to the contrary, including the conclusions of the four panel members who independently determined that DeVore deserved the position over Bodaghi. I examine below each fact on which the ALJ and the majority rely.

The majority leans on the ALJ's finding that DeVore did not administer rights-of-way while working as a District Manager for the Land Board. However, they fail to recognize that the reallocated position required "three years of professional right-of-way experience," and the Human Resources Manager for the Department of Natural Resources reviewed DeVore's application and concluded that he met the minimum requirements for the job before she submitted DeVore's appli-

cation to Vezzani. DeVore testified before the ALJ that he engaged in right-of-way activities for more than the required three years prior to joining the Land Board.

The ALJ concluded that the Department illegally discriminated against Bodaghi when, contrary to past practices, it instituted a rigorous selection process for the reallocated position. This modification alone cannot demonstrate discriminatory intent. If it did, no employer would be able to modify hiring practices in any way where the employer, prior to making the process change, knows of a potential candidate from a protected class. As the ALJ aptly noted, there is nothing inherently wrong with an agency changing its selection procedures. However, the ALJ disapproved of making the process significantly more challenging than before, even though all candidates participated in the new process and no evidence indicated any inherent biases in the new procedures. Vezzani's implementation of a new, neutral and comprehensive process does not support the decision that the Department discriminated against Bodaghi.

Next, the ALJ found fault with the memorandum sent by Vezzani that outlined his decision to change the process, and his encouragement of employees to apply. The ALJ criticized the Bodaghi memo because it differed from the Price memo. The ALJ erred in its analysis of this fact. Vezzani sent the Bodaghi memo to employees several days before sending the Price memo to the same employees. Because he had not sent memos in the past in such instances, Vezzani logically explained that he intended to modify the hiring system for reallocated positions. To avoid any confusion, the Bodaghi memo clearly explained that anyone could apply for the position. It would have been redundant to include the same messages on the Price memo delivered to the staff four days later. The employees, including Bodaghi, who testified at the hearing indicated that the memoranda were identical. Thus, even those to whom Vezzani directed the memos found no fault with them. The mere existence of the memoranda and the language contained therein does not support the ALJ's finding of improper discrimination.

The ALJ also concluded that the Department could not possibly have favored DeVore's appraisal skills because such skills were not included in the job requirements. This conclusion defies logic. Employers generally interview those applicants who possess the minimum skills for the job; employers often choose to hire the applicant who possesses more than the minimum skills and credentials. Undoubtedly, an inference of unlawful discrimination may arise when an employer places value on an unnecessary or inapplicable skill, but such a case is not present here. All members of the panel concluded that DeVore was the best candidate for the job, and the Department has since added appraisal responsibilities to the position, thereby demonstrating the relevance of those skills. Furthermore, the job description, drafted by Bodaghi, stated in several areas that the position required land valuation and appraisal report review. Thus, although the job requirements did not specifically list appraisal certification, it remained part of the duties of the job. Indeed, Bodaghi testified that in his prior job, he directed all appraisal reports to DeVore for his review. Thus, it would be logical to incorporate that skill into the new position and avoid one additional step.

Finally, the ALJ placed significant weight on the testimony of Vezzani that he expected more of a Program Administrator than of an Engineering Technician II, the classification of the position prior to the reallocation. Under the circumstances, the statement makes perfect sense. Increasing levels of responsibility often go hand in hand with increases in grade and pay. All of the panel members expected that DeVore would enhance the position. Although it appears Bodaghi demonstrated that he may also have had the capacity to excel in the position, proven, past performance in one job does not compel promotion to a more complex or demanding job.

Although several witnesses suggested that Vezzani sought to create his own management team with hand-picked people, not a single witness, other than Bodaghi, testified that national origin had anything to do with DeVore's selection. In fact Bodaghi merely

testified "[a]nd also for some reason that I don't know, maybe what I based my discrimination [sic], because of my nationality, that he just didn't want me within the management level." It appears Bodaghi did not know why Vezzani selected DeVore, and apparently, he was unwilling to accept the fact that another candidate may have been more highly qualified.

Accordingly, I do not view the record as supporting the ALJ's finding that the Department's choice of DeVore was a pretext for discrimination.

### C.

Unlike the majority, I see little similarity between this case and *Big O*. In *Big O*, Thurman, an African–American woman and inside-sales clerk, violated company policies resulting in the termination of her employment with Big O. *See Big O*, 940 P.2d at 398. Before an administrative law judge, Thurman established a prima facie case of illegal discrimination. *See id.* at 401. Big O rebutted the presumption by articulating a legitimate, nondiscriminatory reason for firing Thurman: namely, that she had violated company policy after being warned in writing that such violation would result in her termination. *See id.* In response, Thurman demonstrated that during the same period, Big O did not discipline a Caucasian, female inside-sales clerk who violated the same rules.[9] *See id.* at 401–02. We concluded that sufficient evidence existed to find that the asserted reason was a pretext for discrimination. *See id.* at 402. Specifically, we held "[w]here a prima facie case of discrimination is proven and the reasons given for discharge are found to be a *pretext for discrimination,* no additional evidence is required to infer intentional discrimination." *Id.* (emphasis added).

This case is very different from *Big O*. In *Big O*, two employees of different races engaged in the same improper behavior. The employer terminated only the employee from a protected class. Under those circumstances, we concluded that the plaintiff

proved that the business reason was a pretext for discrimination.

Bodaghi presented no such compelling evidence of unlawful discrimination. Rather, the evidence suggests that the Department planned to treat the two reallocated positions in exactly the same manner. Furthermore, unlike in *Big O* where the employer did not reasonably explain why it treated the employees differently, the Department provided reasonable explanations for its decision to prospectively modify the selection system for reallocated positions and its selection of DeVore. The facts, even as determined by the ALJ, support the claim that the Department wanted to ensure that it placed the top candidate in high level reallocated positions, that the employees wanted a more open hiring process, and that the Department made a well-grounded decision when it selected DeVore.

### IV.

The majority notes that discrimination can be subtle and difficult to prove. I agree, and the courts have addressed that issue by the method of shifting burdens once the plaintiff proves a prima facie case. However, there must still be evidence from which the factfinder can conclude that the reason the plaintiff was not hired was illegitimate and served to disguise invidious and illegal discrimination. Here, the evidence raises no such inference. It remains the plaintiff's burden to prove discrimination by some logical inference inherent in the evidence, and in this case, the plaintiff failed to meet that burden. Therefore, I respectfully dissent.

I am authorized to state that Justice RICE joins in this dissent.

---

9. Big O terminated the Caucasian clerk shortly after receiving notification and a copy of Thur-

man's charge.