Jennifer ST. CROIX, M.D., Plaintiff–Appellant,

v.

UNIVERSITY OF COLORADO HEALTH SCIENCES CENTER and Mark Nehler, M.D., Defendants–Appellees.

No. 05CA2746.

Colorado Court of Appeals, Div. IV.

May 17, 2007.

Zodrow, P.C., John F. McBride, John J. Zodrow, Denver, Colorado, for Plaintiff–Appellant.

Office of University Counsel, Patrick T. O'Rourke, Denver, Colorado, for Defendant–Appellee University of Colorado Health Sciences Center.

Montgomery Little Soran Murray & Kuhn, P.C., Amy E. Cook–Olson, Denver, Colorado, for Defendant–Appellee Mark Nehler, M.D.

Opinion by Judge BERNARD.

In this employment discrimination case, plaintiff, Dr. Jennifer St. Croix, appeals the trial court's summary judgment in favor of defendants, the University of Colorado Health Sciences Center (UCHSC) and Dr. Mark Nehler, her supervisor. We affirm.

## I. Background

### A. Residency Program

The following facts are undisputed. Dr. St. Croix is a woman of Asian descent who was employed in a general surgery residency at UCHSC from June 2001 until January 2003. A residency is a four-year educational program following medical school that em-

phasizes fundamental technical skills and allows residents to learn pre-operative and post-operative care. To show residents the various surgical procedures, UCHSC requires them to rotate through a number of surgical specialties. Dr. St. Croix received training at four Denver hospitals, and was evaluated by an attending physician at the conclusion of each rotation. Dr. St. Croix's evaluations were consistently poor. She also scored at the bottom of her class on written examinations.

The promotions committee did not believe Dr. St. Croix adequately completed her first year of residency, but did not have a program in place to allow her to repeat the year. Thus, in April 2002, the committee promoted Dr. St. Croix to the second year of residency, but placed her on probation. Under the conditions of her probation, Dr. St. Croix was to perform at the "A" and "B" level to remain in the residency program. However, through the end of 2002, she continued to receive many "C" and "D" marks and poor evaluations from attending physicians.

## B. Photographs

In December 2002, Dr. Nehler was informed by another surgical resident that the resident had seen pornographic photographs of Dr. St. Croix on the Internet. Dr. Nehler downloaded the photos and showed them to Dr. St. Croix. She provided no explanation about them.

Subsequently, Dr. St. Croix admitted she posed for nude photographs when she was in college, but claimed they were "tasteful." She suggested the photographs Dr. Nehler showed her may have been altered from their original form. In an affidavit filed in opposition to UCHSC and Dr. Nehler's motion for summary judgment, Dr. St. Croix stated the photographs were not of her, but that they "resembled" her.

Knowledge of the photographs spread throughout the residency program and to the hospitals in which the residents worked. Dr. St. Croix claims she was subjected to rumors, innuendo, "knowing" looks, and comments, all of which caused her great embarrassment.

## C. Termination from Residency Program

Dr. Nehler met with Dr. St. Croix on January 21, 2003. In an affidavit submitted in opposition to defendants' summary judgment motion, Dr. St. Croix stated Dr. Nehler asked for her resignation at this meeting, citing the pornographic pictures as the primary reason for the request, which pictures had "caused [them] to review [her] file and decide to terminate [her] from the program." According to the affidavit, Dr. Nehler said the photographs were the "precipitating factor" leading to the reassessment of Dr. St. Croix's status in the residency program.

Dr. St. Croix chose not to resign. Ten days after the January 21 meeting, Dr. Nehler sent Dr. St. Croix a letter. The letter stated Dr. St. Croix was being terminated from the residency program because she had not met the terms of her academic probation. The letter did not make any reference to the photographs.

In March 2003, Dr. Nehler submitted a letter to an associate dean of UCHSC explaining the decision to terminate Dr. St. Croix. He summarized the basis for the termination decision as follows:

> [T]he fact that information regarding the sexually explicit website and advertisements was well known by faculty and residents constituted a grave distraction to her training within the residency program, and made further remediation impossible. The sexually explicit website was one factor, but ultimately, the decision was based on the fact that she had not progressed, that further remediation was not possible, and that she had already violated the terms of her probation.

Pursuant to UCHSC policy, Dr. St. Croix sought review of the decision to terminate her from the residency program by a committee of doctors. At the review hearing, Dr. Nehler said many employees at different hospitals had seen the photographs. He added he was concerned patients' families or the press would find out about them, raising issues about UCHSC's credibility. Dr. Nehler stated that knowledge of the photographs would make it

very difficult to remediate [Dr. St. Croix] ... if she was an A resident, but in her situation way before these pictures came out, she was failing academically. [Learning of the photographs] cause[d] us to scrutinize her probation more than we had previously and review everything carefully. And we really realized that she was failing academically.... [W]e didn't [think] we could remediate her in this environment and we moved forward.

After hearing the statements of Dr. Nehler, Dr. St. Croix, and several doctors who had supervised Dr. St. Croix, as well as reviewing several documents and written evaluations of Dr. St. Croix's performance, the committee upheld Dr. Nehler's decision to terminate Dr. St. Croix from the residency program.

### D. Dr. St. Croix's Claims

#### 1. The Pleadings

Dr. St. Croix subsequently filed suit against UCHSC and Dr. Nehler, claiming she was improperly terminated from the residency program. She alleged she had been subjected to disparate treatment on account of her race and gender, because other residents who were not members of a protected class were treated more leniently than she had been treated, despite having engaged in equally serious or more serious misconduct. Dr. St. Croix also contended she had endured a hostile work environment, created by rumors and innuendo arising from broad knowledge of the photographs, and UCHSC and Dr. Nehler had not taken any action to abate it or discipline those who had sexually harassed Dr. St. Croix by circulating the photographs.

We note Dr. St. Croix did not, before the trial court or on appeal, rely upon § 24–34–402.5, C.R.S.2006 (unlawful prohibition of legal activities as a condition of employment), and argue her termination was due to her "engaging in any lawful activity off the premises of the employer during nonworking hours." Thus, we do not address the application of § 24–34–402.5.

#### 2. The Trial Court's Order

UCHSC and Dr. Nehler moved for summary judgment. The trial court granted the motion, concluding there were no disputed material facts on the following issues: (1) Dr. St. Croix did not establish a prima facie case of disparate treatment because she was not similarly situated to other residents; her conduct in posing for the pictures was different from the conduct of other residents in looking at the photographs and gossiping about them; (2) even if she had established a prima facie case, Dr. St. Croix did not establish that UCHSC and Dr. Nehler's nondiscriminatory reason for her discharge—failing to satisfy the terms of her probation—was a pretext for discrimination against her because of her race or gender; and (3) the conduct Dr. St. Croix described as the basis for her hostile work environment claim—unspecified comments made "under people's breaths" as they passed her in the hall, snickers, and "knowing looks"—was insufficient to establish the existence of a hostile work environment.

## II. Summary Judgment

We review de novo a trial court's grant of summary judgment. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251, 1256 (Colo.1995). Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *HealthONE v. Rodriguez,* 50 P.3d 879, 887–88 (Colo.2002). In order to determine whether summary judgment is proper, the nonmoving party is entitled to the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts, and all doubts as to whether an issue of fact exists must be resolved against the moving party. *Mancuso v. United Bank,* 818 P.2d 732, 736 (Colo. 1991).

A court must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in determining whether to grant a motion for summary judgment. C.R.C.P. 56(c). Summary judgment is a drastic remedy, to be granted only when there is a clear

showing that the applicable standards have been met. *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo.2003).

### III. Discriminatory Termination

#### A. Law of Discriminatory Termination

Dr. St. Croix's employment discrimination claim arises under the Colorado Anti–Discrimination Act. Section 24–34–402(1)(a), C.R.S.2006, provides:

> It shall be a discriminatory or unfair employment practice ... [f]or an employer to refuse to hire, to discharge, to promote or demote, to harass during the course of employment, or to discriminate in matters of compensation against any person otherwise qualified because of disability, race, creed, color, sex, age, national origin, or ancestry.

The language of this section parallels that of its federal counterpart in Title VII of the Civil Rights Act of 1962, 42 U.S.C. § 2000e–2(a), and thus, we look to federal cases for guidance in applying the Colorado statute. *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo.1997).

■ The most obvious evil addressed by Title VII and the Colorado Anti–Discrimination Act occurs when an employer subjects an employee to disparate treatment, meaning the employer treats certain employees more harshly because of a characteristic such as race or gender. Proof of discriminatory intent is a necessary and crucial element of a disparate treatment claim. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977).

■ In most cases, a plaintiff lacks direct evidence of an employer's discriminatory motivation and must prove intent indirectly by way of inference. Colorado has adopted the following approach, modeled on the Supreme Court's analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for proving an inference of discriminatory intent. Initially, the plaintiff must establish a prima facie case of discrimination by showing (1) he or she belongs to a protected class; (2) he or she was qualified for the job at issue; (3) he or she

suffered an adverse employment decision despite his or her qualifications; and (4) the circumstances give rise to an inference of unlawful discrimination. *Colo. Civil Rights Comm'n v. Big O Tires, Inc., supra*, 940 P.2d at 400.

■ If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. If the employer produces such an explanation, the plaintiff must then be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for the employment decision were in fact a pretext for discrimination. *Colo. Civil Rights Comm'n v. Big O Tires, Inc., supra*, 940 P.2d at 401.

■ Intentional discrimination is presumed if a plaintiff proves a prima facie case unrebutted by an employer's offer of a nondiscriminatory reason for an adverse job action. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A nondiscriminatory reason is one that is not prohibited by the Colorado Anti–Discrimination Act, namely, a reason that is not based on factors such as disability, race, creed, color, sex, age, national origin, or ancestry. *See Equal Employment Opportunity Comm'n v. Flasher Co.*, 986 F.2d 1312, 1316 n. 4 (10th Cir.1992); *Bodaghi v. Dep't of Natural Res.*, 995 P.2d 288, 307 (Colo.2000).

■ Once such a reason is provided, however, the presumption of discrimination "drops out of the picture"; at that point, the trier of fact must decide the ultimate question of whether the employer intentionally discriminated against the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The burden of proving intentional discrimination always remains with the plaintiff. *Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1248 (Colo.2001); *Bodaghi v. Dep't of Natural Res., supra*, 995 P.2d at 298.

■ Plaintiffs typically demonstrate pretext in one of three ways: (1) with evidence

that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir.2000).

"A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Kendrick v. Penske Transp. Servs., Inc., supra,* 220 F.3d at 1230. The plaintiff bears the burden of proving different treatment from that of similarly-situated employees. *Tex. Dep't of Cmty. Affairs v. Burdine, supra,* 450 U.S. at 258, 101 S.Ct. at 1096.

To carry this burden, the plaintiff must show that the employees who were treated differently were similarly situated to the plaintiff in all relevant respects. To be similarly situated, other employees must be supervised by the same person, and subject to the same standards concerning performance, evaluation, and discipline. *McGowan v. City of Eufala,* 472 F.3d 736, 745 (10th Cir.2006). In evaluating whether employees are similarly situated, a court should "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir.1997). In order for the disparate treatment of other employees to be relevant, they must have engaged in conduct of "comparable seriousness" to the plaintiff's conduct. *Kendrick v. Penske Transp. Servs., supra,* 220 F.3d at 1230.

### B. Summary Judgment in Discriminatory Termination Cases

A court looks to a variety of factors in evaluating a motion for summary judgment when a plaintiff is relying upon proving discriminatory intent by way of the inferential model established by *McDonnell Douglas Corp. v. Green, supra.* These include the strength of the plaintiff's prima facie case, the probative value of the plaintiff's evidence indicating the employer's explanation of the reason for dismissal is false, and any other evidence supporting the employer's case that is properly considered on a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)(discussing judgment as a matter of law under Fed. R.Civ.P. 50; and stating "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"); *see Jackson v. Loftis,* 189 Fed. Appx. 775, 778, 2006 WL 2053822 (10th Cir. 2006) (citing *Reeves* when addressing summary judgment standards); *Hinson v. Clinch County Bd. of Educ.,* 231 F.3d 821, 827 (11th Cir.2000)(standard for granting summary judgment under Fed.R.Civ.P. 56 mirrors the standard for granting judgment as a matter of law under Fed.R.Civ.P. 50).

Indeed:

[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves v. Sanderson Plumbing Prods., Inc., supra,* 530 U.S. at 148, 120 S.Ct. at 2109; *see also Durham v. Xerox Corp.,* 18 F.3d 836, 840 (10th Cir.1994) (summary judgment properly granted because, "[w]ithout proof of pretext or direct evidence of discriminatory intent, [plaintiff] cannot meet her ultimate burden of proving intentional discrimination").

When a plaintiff alleges an employer's asserted explanation for terminating an employee was a pretext for discrimination, the plaintiff must demonstrate

"such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment.

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999) (citation omitted; quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)). The reason for this requirement is obvious: the court's role is to prevent intentional discrimination, not to act as a " 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

### C. Analysis of Discriminatory Termination Claim

Dr. St. Croix contends the trial court erred in granting summary judgment on her claim she was wrongfully terminated from the residency program because of her race and gender. We disagree.

#### 1. Prima Facie Case

■ Dr. St. Croix belongs to protected classes because she is a woman of Asian descent. She suffered an adverse employment decision when she was terminated from the residency. Thus, whether Dr. St. Croix has established a prima facie case depends on the second and fourth requirements in *Big O Tires*.

UCHSC and Dr. Nehler argue Dr. St. Croix failed to establish the second requirement because she was not qualified for the residency in that she was on probation for poor performance. *See Hason v. Univ. of Cal. Bd. of Regents*, 35 Fed.Appx. 340, 2002 WL 464809 (9th Cir.2002). Dr. St. Croix counters that UCHSC cannot use its proffered reason for terminating her to defeat her prima facie case. *See MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1119–21 (10th Cir.1991); *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 n. 3 (11th

Cir.1988); *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1495 n. 2 (11th Cir.1987). The weight of authority on this issue, including the law in the Tenth Circuit, supports the position taken by Dr. St. Croix, and thus, we turn our attention to the fourth requirement, whether the circumstances give rise to an inference of unlawful discrimination.

Dr. St. Croix argues proof of disparate treatment is not necessary to establish a prima facie case of employment discrimination. She relies on *Kendrick v. Penske, supra*, in which the court held a plaintiff in a discriminatory discharge case need not show the employer treated similarly-situated nonminority employees more favorably in order to establish a prima facie case. *Kendrick v. Penske Transp. Servs., Inc., supra*, 220 F.3d at 1229. Such a plaintiff need only show: (1) he or she belongs to a protected class; (2) he or she was qualified for the position; (3) despite his or her qualifications, he or she was discharged; and (4) the position was not eliminated after his or her discharge. *Kendrick v. Penske Transp. Servs., Inc., supra*, 220 F.3d at 1229 (citing *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir.1999)). Proof that a qualified individual in a protected class was discharged and his or her position remained open after the discharge raises an inference of discrimination because it eliminates the two most common legitimate justifications for discharge—lack of qualification and elimination of the position. *Perry v. Woodward, supra*, 199 F.3d at 1140.

Other circuits have reached the same conclusion as *Kendrick* in discriminatory discharge cases. *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir.1999)("[N]othing in Title VII requires a gender-discrimination plaintiff to prove that he or she was 'replaced by someone outside the protected class'...." (quoting *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 792 (3d Cir. 1985)) ); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir.1998)("[A] plaintiff may establish ... a *prima facie* case by demonstrating that the discharge occurred in circumstances giving rise to an inference of unlawful discrimination."); *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 n. 7 (5th Cir.1997)("While the

fact that one's replacement is of another national origin 'may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition.'" (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir.1996))).

■ We are persuaded that proof of disparate treatment is not necessary to establish a prima facie case of employment discrimination in discriminatory discharge cases. Rather, as indicated above, proof of disparate treatment becomes relevant in assessing whether an employer's proffered reason for terminating an employee is a pretext for intentional discrimination. *See Kendrick v. Penske Transp. Servs., Inc., supra,* 220 F.3d at 1230.

Thus, we conclude, contrary to the trial court, that Dr. St. Croix has established a prima facie case: (1) she belongs to protected classes; (2) she was qualified for the residency; (3) despite her qualifications, she was discharged; and (4) the position was not eliminated after her discharge. However, this difference in analysis does not necessarily dictate that we reach a different conclusion from the trial court on the ultimate issue of whether the grant of summary judgment was appropriate. We now turn to the question of whether there were material issues of fact that: (1) UCHSC and Dr. Nehler articulated nondiscriminatory reasons for terminating Dr. St. Croix from the residency program; and, if so, (2) Dr. St. Croix's proof indicated the nondiscriminatory reasons were a pretext for discrimination.

### 2. Employer's Explanation

■ The burden of production shifted to UCHSC and Dr. Nehler to articulate some legitimate, nondiscriminatory reason for discharging Dr. St. Croix. UCHSC and Dr. Nehler asserted two reasons for terminating Dr. St. Croix. First, she was not meeting the terms of her academic probation. This was a legitimate, nondiscriminatory reason for termination. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005)("[p]oor performance is a quintessentially legitimate and nondiscriminatory reason for termination").

Second, according to Dr. Nehler, the discovery of the photographs on the Internet threatened UCHSC's credibility with the community and made further remediation for Dr. St. Croix "very difficult." This explanation does not implicate Dr. St. Croix's race or gender, but rather focuses on UCHSC's concern for its reputation, the risk of losing the confidence of its patients, and its assessment of the prospects of improving Dr. St. Croix's performance as a surgical resident. These are business-related considerations that, on their face, do not imply race- or gender-based motivation. Thus, this explanation does not indicate a discriminatory purpose. *See Panis v. Mission Hills Bank*, 60 F.3d 1486, 1490–92 (10th Cir.1995)(nondiscriminatory reason for firing bank employee was doubt about employee's credibility with customers and their concerns about safety of deposited funds in light of publicity surrounding embezzlement charges filed against employee's husband); *Garner v. St. Louis Sw. Ry.*, 676 F.2d 1223 (8th Cir.1982)(discharge for damage to company's reputation and arrest for rape was nondiscriminatory reason for termination); *Lugo v. Milford Mgmt. Corp.*, 956 F.Supp. 1120, 1129 (S.D.N.Y.1997)(violation of company policy against being intoxicated while at work as a security guard, which compromised security of building and damaged employer's reputation with tenants, was a nondiscriminatory reason for termination); *Woodbury v. Sears, Roebuck & Co.*, 901 F.Supp. 1560, 1564 (M.D.Fla.1995)(arrest at work that would cause disruption of the workplace was a nondiscriminatory reason for termination); *cf. City of San Diego v. Roe*, 543 U.S. 77, 81, 125 S.Ct. 521, 524, 160 L.Ed.2d 410 (2004) (terminating police officer for producing and posing in sexually explicit videos offered for sale on the Internet did not violate his First Amendment rights; "[a]lthough [the officer's] activities took place outside the workplace and purported to be about subjects not related to his employment, the [police department] demonstrated legitimate and substantial interests of its own that were compromised by his speech").

The concerns about UCHSC's reputation and the difficulty of remediating Dr. St. Croix's performance are arguably subjective.

Some courts view the use of subjective decision-making criteria with skepticism. *See Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1218 (10th Cir.2002). Other courts see no difference between subjective reasons for termination and objective ones. *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("It is inconceivable that Congress intended Anti–Discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation.... Subjective reasons can be just as valid as objective reasons." (citation omitted) ).

Even assuming, without deciding, that subjective reasons should be scrutinized carefully because of their "susceptibility to discriminatory abuse," *Bell v. Bolger*, 708 F.2d 1312, 1319–20 (8th Cir.1983), we conclude it is clear there must be some additional information beyond the mere subjectivity of the nondiscriminatory reason to establish that the reason was a pretext for discrimination. *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1195 (10th Cir.2006); *Bell v. Bolger*, *supra*, 708 F.2d at 1320 ("[U]se of ... a subjective rating device, coupled with statistical evidence of a pattern of discrimination, may be probative evidence of pretext.").

### 3. Evidence of Pretext

Turning to the third step in the burden-shifting analysis, we conclude Dr. St. Croix failed to provide evidence sufficient to survive summary judgment that UCHSC and Dr. Nehler's proffered reason for her termination was a pretext for discrimination.

When considering a pretext challenge, a court must look at the facts as they appeared to the person making the termination decision, not as they may have appeared to the terminated employee. *Kendrick v. Penske Transp. Servs., Inc.*, *supra*, 220 F.3d at 1231. The issue is not whether the reasons for termination were "wise, fair or correct," but whether the employer believed those reasons to be true and whether the employer acted upon those reasons in good faith. *Rivera v. City & County of Denver*, 365 F.3d 912, 924–25 (10th Cir.2004)

(quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir.1999)). Thus, the employer's good faith perception of "the employee's performance ... is relevant, not [the employee's] subjective evaluation of [her] own relative performance." *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir.1999)(quoting *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir.1996)). A factfinder must be able to conclude, by a preponderance of the evidence, that "discrimination was a determinative factor in the employer's actions—simply disbelieving the employer is insufficient." *Young v. Dillon Cos.*, *supra*, 468 F.3d at 1250 (emphasis deleted) (quoting *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir.2005)).

### a. Similarly–Situated Employees

Although we have concluded that evidence of different treatment of similarly-situated employees was not pertinent to Dr. St. Croix's prima facie case, such proof becomes relevant when evaluating whether an employer's proffered reason for termination was a pretext for discrimination. *See Kendrick v. Penske Transp. Servs., Inc.*, *supra*; *Morgan v. Hilti, Inc.*, *supra*, 108 F.3d at 1324 ("A satisfactory showing that similarly situated employees, who do not belong to the protected class, were treated differently with regard to violation of a work rule could have lent support to the pretext argument.").

Dr. St. Croix argues she was similarly situated to Caucasian male residents who viewed and circulated the pornographic photos, because their conduct created the same harm as did her posing for the photos: both damaged the credibility of UCHSC, created the possibility that patients or the media would find out, and raised other ethical and safety concerns. We do not agree.

Dr. St. Croix was not subjected to the same work standards as the Caucasian male employees to whom she compares herself. Dr. St. Croix had been placed on probation, a status described in the Housestaff Manual given to all residents, for poor performance. She was, therefore, subjected to different standards from residents who were not on probation, such as the requirement she only

receive grades of "A" or "B." It is undisputed Dr. St. Croix failed to meet those standards.

██ Employees who are on probation are not similarly situated to employees who are not on probation, because they are not, under *McGowan v. City of Eufala, supra,* comparable in "all relevant respects." *See Riser v. Target Corp.,* 458 F.3d 817, 822 (8th Cir. 2006); *Steinhauer v. DeGolier,* 359 F.3d 481, 484–85 (7th Cir.2004); *Bogren v. Minnesota,* 236 F.3d 399, 405 (8th Cir.2000); *Ghane v. West,* 148 F.3d 979, 982 (8th Cir.1998); *Herr v. Airborne Freight Corp.,* 130 F.3d 359, 362 (8th Cir.1997); *McKenna v. Weinberger,* 729 F.2d 783, 789 (D.C.Cir.1984); *Mitchell v. Sec'y Veterans Affairs,* 467 F.Supp.2d 544, 552 (D.S.C.2006); *Jones v. Yonkers Pub. Schs.,* 326 F.Supp.2d 536 (S.D.N.Y.2004); *Mercer v. City of Cedar Rapids,* 104 F.Supp.2d 1130, 1144–47 (N.D.Iowa 2000), *aff'd,* 308 F.3d 840 (8th Cir.2002).

Thus, assuming, without deciding, that Dr. St. Croix's conduct was no different from, and not more culpable than, the conduct of the residents who circulated the photographs, we conclude she is still unable to establish that similarly-situated employees were treated differently because these residents were not on probation.

#### b. Reasons for Termination

There is no evidence in the record to indicate the reasons UCHSC and Dr. Nehler stated as the reasons for termination were false, designed to cover up discrimination against Dr. St. Croix because of her race or her gender.

#### i. Probation

It was undisputed Dr. St. Croix was on probation. Her reviews during the probationary period contained many "C" and "D" grades, which were below the "A" and "B" grades required if her residency were to continue. One reviewer for October 2002 wrote:

> Should not continue. The End. Dangerous. Has not progressed beyond intern level.... Appears to avoid patient care/decision making due to lack of confidence and poor fund of knowledge. No improvement since last rotation. I cannot support her promotion to senior resident due to marginal performance and lack of improvement.... [Dr. St. Croix] is in the wrong field.

A reviewer for December 2002 observed, "[Dr. St. Croix] showed minimal improvement in her rotation. Concerns about her ability to independently function exist."

#### ii. Photographs

We evaluate an allegation that an explanation is a pretext for discrimination from the employer's perspective. *Kendrick v. Penske Transp. Servs., Inc., supra.* Although Dr. St. Croix has disputed she was depicted in the pornographic pictures, there is no evidence in the record to indicate UCHSC or Dr. Nehler did not have a good faith belief it was her. Dr. Nehler stated he showed the photographs to several others who knew Dr. St. Croix, and they agreed with him the photographs were of her.

There is no indication in the record that UCHSC and Dr. Nehler were concerned about Dr. St. Croix's appearing in the pictures because of her gender. Both women and men appear in pornography. Rather, the record indicates the concerns were focused upon what effect Dr. St. Croix's putative presence in the photographs would have upon UCHSC's reputation and upon the ability to improve her work performance, which were matters unconnected to Dr. St. Croix's gender.

There is no evidence in the record to indicate the problems created by the photographs, as expressed by UCHSC and Dr. Nehler, were a pretext for discharging Dr. St. Croix because of her race or gender. While their concerns about UCHSC's reputation and their conclusion that knowledge of the photographs would make it "very difficult" to remediate Dr. St. Croix even if she had been an "A" student may or may not have been "wise, fair, or correct," the only evidence in the record is that UCHSC and Dr. Nehler believed these concerns to be true and acted upon them in good faith. *See Rivera v. City & County of Denver, supra.*

Dr. St. Croix did not, under *Anderson v. Coors Brewing Co., supra,* 181 F.3d at 1179,

provide evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the explanations offered by UCHSC and Dr. Nehler that "a reasonable factfinder could rationally find . . . unworthy of credence" and thus infer UCHSC's and Dr. Nehler's explanations were a pretext for discrimination. The state of the record is that UCHSC and Dr. Nehler in fact relied on the explanation they provided for making the termination decision, and not on some other reason. *See Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1080 (10th Cir.1999) (issue was not whether in fact employee intended to engage in sexual harassment, but whether employer actually perceived employee's conduct as sexual harassment, or used that rationale as a pretext for discrimination); *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997) (the pertinent question is not whether the employer is right to believe an employee engaged in misconduct, but whether the belief was genuine or pretextual); *Billups v. Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir.1991)("an ill-informed decision or an ill-considered decision is not automatically pretextual if the employer gave an honest explanation for termination"); *Brucks v. O'Neill*, 184 F.Supp.2d 1103, 1114 (D.Kan. 2001)("[t]here is no showing that the interviewers did not in fact rely upon the factors they claim to have considered in arriving at their decision").

There is no evidence to show discrimination was the motivating factor in the decision to fire Dr. St. Croix. *See Young v. Dillon Cos., supra*. Rather, there is only conjecture about the motives of UCHSC and Dr. Nehler, which is insufficient to defeat a motion for summary judgment. *See Anderson v. Coors Brewing Co., supra*.

We recognize that, in this age of computers, employees could be "set up" for termination by others altering photographs, in which the employees appear, to make the pictures lewd and then distributing the altered pictures to the employer. We do not condone such behavior.

However, in resolving the summary judgment issue before us, we must focus on the employer's explanation and examine the record to see whether there is any evidence to indicate the employer's explanation is a pretext for discrimination. Here, the record contains no indication that such a plot existed, that UCHSC or Dr. Nehler was complicit in such a plot, or that either doubted the authenticity of the photographs.

### 4. Conclusion

The decision to terminate Dr. St. Croix was based upon a combination of two factors: her poor performance while on probation and the photographs. The record establishes these reasons served as a nondiscriminatory basis to terminate Dr. St. Croix from the residency program. Dr. St. Croix did not produce evidence to indicate these reasons were a pretext to cover up a discriminatory motive.

The record conclusively reveals nondiscriminatory reasons for Dr. St. Croix's termination from the residency program. Dr. St. Croix created no issue of fact, or, at most, a weak one, as to whether UCHSC's and Dr. Nehler's reasons for terminating her were untrue. There was abundant and uncontroverted independent evidence that Dr. St. Croix was not subjected to discrimination. Thus, there was no genuine issue of material fact in this case, *see Reeves v. Sanderson Plumbing Prods., Inc.; HealthONE v. Rodriguez, supra*, and summary judgment on this issue was proper. *See Kendrick v. Penske Transp. Servs., Inc., supra*.

### IV. Hostile Work Environment

Dr. St. Croix contends the trial court erred in granting summary judgment on her claim that she was subjected to a hostile work environment. We disagree.

In order for a hostile work environment sexual harassment claim to withstand judgment as a matter of law, the plaintiff must show a rational jury could find that "[t]he workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)(quoting

*Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)).

 Under the *Meritor–Harris* standard, the plaintiff must show the environment was both subjectively and objectively hostile or abusive. *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir. 1998). An objectively hostile working environment is one that a reasonable person would find hostile or abusive; a subjectively hostile workplace is one the plaintiff employee perceives as hostile. *Harris v. Forklift Sys., Inc., supra,* 510 U.S. at 21–22, 114 S.Ct. at 370–71. To determine whether a workplace is hostile or abusive, a court considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; ... whether it unreasonably interferes with an employee's work performance"; and the context of the conduct. *Harris v. Forklift Sys., Inc., supra,* 510 U.S. at 23, 114 S.Ct. at 371.

 The plaintiff must also show the harassment stemmed from racial or gender animus. *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994); *see Riske v. King Soopers,* 366 F.3d 1085, 1091 (10th Cir.2004) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] ... because of ... sex.'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998))). Thus, "[t]he critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Riske v. King Soopers, supra,* 366 F.3d at 1091 (quoting *Harris v. Forklift Sys., Inc., supra,* 510 U.S. at 25, 114 S.Ct. at 372 (Ginsburg, J., concurring)). "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir.1994).

Dr. St. Croix argues the treatment she received was humiliating and intolerable, and caused her to lose self-respect. She submits this evidence was sufficient to establish a subjectively hostile work environment. Dr. St. Croix also argues the evidence was sufficient to establish an objectively hostile work environment, based on Dr. Nehler's admission that he did not see how she could continue to work in the atmosphere created by the circulation of the pornographic photos.

The trial court disagreed, finding both the frequency and severity of the comments insufficient, as a matter of law, to establish a hostile work environment. *See Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1539 (10th Cir.1995) (a plaintiff claiming a hostile work environment must demonstrate more than a few isolated instances of sexual or racial enmity and must instead prove that she was subjected to a "steady barrage" of sexual or racial comments and conduct). We agree with the trial court's conclusion.

There is no suggestion in the record that Dr. St. Croix was subjected to any form of harassment because of her race. Rather, the focus of her argument is that she was harassed because of her gender.

Dr. St. Croix must produce evidence that she was the object of harassment because of her gender. Conduct directed at an employee that is overtly sexual may be presumed to occur because of the employee's gender. *Penry v. Fed. Home Loan Bank,* 155 F.3d 1257, 1261 (10th Cir.1998).

Dr. St. Croix did not identify the content of any comments she allegedly received. She did not identify who spread rumors, or what the rumors were. She did not identify who gave her "knowing" looks, or what these "knowing" looks purportedly meant. She did not allege how often these instances occurred. She does not claim other residents showed her pornography by showing her the photographs. She does not refer to sexual propositions, specific innuendo, or sexually derogatory language. In short, there is no proof of conduct aimed at Dr. St. Croix because of her gender, let alone any conduct that was overtly sexual.

Dr. St. Croix contends Dr. Nehler's statement that knowledge of the pictures would make it "very difficult" to remediate her

performance is some proof that Dr. St. Croix labored in a hostile work environment. However, this argument does not carry with it any proof that the work atmosphere was created because of Dr. St. Croix's gender.

Although there is evidence that others in the workplace had seen the photographs, there is no indication in the record that anyone had directed harassing comments at Dr. St. Croix referring to the photographs. She provides only speculation about the substance of discussions outside of her presence about the photographs. For these alleged discussions and viewing of the photographs to be relevant to proof of a pervasively hostile work environment, Dr. St. Croix must know of them and provide some evidence of what occurred during such incidents. *See Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 794 (8th Cir.2004) ("Because a subjectively hostile work environment is one that by definition the plaintiff is aware of, a plaintiff cannot recover for harassment of which he or she is unaware."); *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000)("Mean spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)."). Dr. St. Croix's claim therefore fails because she has not provided information to establish the substance of the rumors and innuendo.

Without any specific allegation of factual support, we cannot conclude that Dr. St. Croix's workplace was subjectively or objectively hostile and that she was the object of harassment because of her gender. Thus, as a matter of law, her hostile work environment claim fails, and summary judgment was proper.

### V. Affidavits in Support of Summary Judgment Motion

Dr. St. Croix contends the summary judgment must be reversed because UCHSC and Dr. Nehler submitted several documents in support of their motion for summary judgment, but did not submit affidavits authenticating the documents, and many of them contained inadmissible hearsay. We disagree.

Failure to authenticate a document or otherwise submit evidence establishing its admissibility precludes consideration of the document for purposes of summary judgment. *Henderson v. Master Klean Janitorial, Inc.*, 70 P.3d 612, 617–18 (Colo.App.2003).

Dr. St. Croix challenged the motion for summary judgment on the ground that UCHSC and Dr. Nehler had not sufficiently demonstrated the admissibility of the supporting exhibits. The trial court ruled there was a proper foundation for the admissibility of the exhibits. In so ruling, the court noted:

> (1) that many of the exhibits were not offered for the truth of the matter asserted; (2) that the University provided an affidavit attesting that the exhibits were business records maintained in the ordinary course of business; (3) Dr. St. Croix herself referred to the exhibits in the brief opposing summary judgment; and (4) Dr. St. Croix listed her entire residency file in her initial disclosures. Under these circumstances, the court determines that there is a proper foundation for the admissibility of the exhibits.

Dr. St. Croix argues the trial court's ruling is insufficient, because it does not specify which exhibits the court relied upon and the basis for the admissibility of each exhibit. Dr. St. Croix does not cite any authority that would require such specificity. In any event, the trial court granted summary judgment, and we affirm, based on Dr. St. Croix's failure to show genuine issues of material fact on both her discriminatory termination and hostile work environment claims.

The summary judgment is affirmed.

Judge CASEBOLT and Judge HAWTHORNE concur.